### BOYD et al. v. HANKINSON et al.

#### (Circuit Court, D. South Carolina. December 3, 1897.)

**1. CONTRACT—MEETING OF MINDS—UNCOMPLETED NEGOTIATIONS.**

On March 8, 1897, one C., the treasurer of a New Jersey corporation, made an offer, conditional on the approval of the stockholders, to sell to defendant, for $5,000, certain lands and buildings owned by the corporation, in Aiken county, S. C. On June 7, 1897, defendant accepted this offer, on condition of the execution of bonds for titles and necessary papers. Before the conditions could be fulfilled the governor of New Jersey declared the corporation's charter forfeited. Some further tentative negotiations followed during August, including suggestions of making title through a sheriff's sale, but defendant still insisted on a bond for titles, which was never given. October 10, 1897, the property in question was sold by the sheriff of Aiken county, under executions dated prior to the governor's proclamation, and was bought for $2,000 by defendant, who paid the money and received the sheriff's deed. He had received no notice from C. of the sale, and was unaware that C. was represented at it. In an action by C. and others, creditors and stockholders of the corporation, to set aside the sale, *held*, that the facts showed no meeting of minds, and no breach of contract or of fiduciary relations by defendant.

**2. EXECUTION—TESTE—DISSOLUTION OF DEFENDANT CORPORATION—SHERIFF'S SALE.**

If, after judgment against a corporation in South Carolina, execution is issued and levied, and at the date of the teste the defendant is in full enjoyment of its franchises, the subsequent dissolution of the corporation does not defeat the right to sell its property and give a good title under the execution.

Fleming & Alexander, for complainants.
Henderson Bros., for defendants.

SIMONTON, Circuit Judge. This case comes up upon bill and answer, with the testimony, for a hearing on the merits. The facts of the case are these: The Southern Pine-Fiber Company, a corporation created by the laws of the state of New Jersey, owned in North Augusta, a town in Aiken county, S. C., three acres of land. On this land had been erected valuable buildings containing machinery for manufacturing matting and other material from pine fiber. The company had ceased manufacturing operations, and had let their property to the Hankinson Lumber Company. On March 8, 1897, W. H. Castle, treasurer of the Southern Pine-Fiber Company, made an offer to the Hankinson Lumber Company to sell this property to it for $5,000, of which $1,000 was to be paid in cash, and $1,000 each year for four years consecutively, represented by notes, each bearing 6 per cent. per annum, title to remain in the Southern Pine-Fiber Company until full payment, and bond for title to be made to the purchasers. The offer was made subject to the approval

of the stockholders, and was to be accepted or rejected within 10 days from March 2, 1897. On 30th May thereafter J. L. Hankinson, president of the lumber company, wrote to W. H. Castle, treasurer, that he had persuaded his father, Luther H. Hankinson, to buy this property, and in his behalf he offered $4,500,—$1,000 cash, and the remainder in four equal annual installments,—in other respects conforming to the first offer. This was declined. On June 7, 1897, J. L. Hankinson, in behalf of Luther H. Hankinson, accepted in writing the offer made on March 8, 1897, adding: "Have papers prepared in the name of L. H. Hankinson, and send same to Mr. Jackson or any one in Augusta, and the notes will be signed and the check given upon delivery of your bond for titles." It will be observed that the offer of W. H. Castle, treasurer, was contingent upon approval by the stockholders. The record discloses no action on their part. So, also, the acceptance was contingent upon bond for titles. Before such bond could be executed, and before such action of the stockholders could be had, information was received that the governor of New Jersey, under his construction of an act of the legislature of New Jersey in such case made and provided, declared the charter of the Southern Pine-Fiber Company to be forfeited. This put an end, apparently, to any further contract with the corporation as a corporation, for no further steps were taken either as to the bond of indemnity or as to the action of stockholders. On July 15, 1897, James Boyd, a director in the fiber company, and a creditor, consulted Messrs. Fleming & Alexander as to whether the property could not be sold at sheriff's sale under some outstanding judgments, and purchased by "one of us" as trustee, and then convey a satisfactory title to Mr. Hankinson. The testimony at this point is somewhat obscure. Messrs. Fleming & Alexander evidently advised that a good sale and a satisfactory title could be made in this way. On August 2, 1897, L. H. Hankinson wrote to W. H. Castle, stating that he had heard that the charter of the company had been forfeited, and that it was necessary for one of the stockholders of the company to apply to the courts to make the transfer; that this would take time, which was valuable to him, as, on the faith of the promise of the company to make proper papers, improvements were being made on the property, and that the work could not be stopped except at great loss. He states that he is advised that the mode of making title by sale under the judgments is not proper. He asks that an inclosed paper be signed in order that he (Hankinson) should be in position to go ahead with the work on the property. The form of agreement inclosed provided for the execution of a bond for titles by Castle to Hankinson.

It will be noticed that a bond for titles was one of the conditions of the proposed contract with the company. This letter shows that Hankinson was willing to carry out an agreement of the same tenor, provided proper papers be executed and a bond for title given. That letter was received on 10th August. The reply was that, if his lawyer approves, he will gladly sign such a paper. It was never signed. The letter of 2d August was written by Mr. Foster, counsel for L. H. Hankinson, who notified Messrs. Fleming & Alexander of its con-

tents before he sent it, and insisted on the bond for titles as a condition necessary for the protection of Mr. Hankinson. The sheriff of Aiken county had in his possession two executions against the Southern Pine-Fiber Company, one dated October 13, 1893, the other dated October 12, 1893, and levied on the land October 12, 1893, and November 7, 1893, before the proclamation of the governor of New Jersey declaring the charter forfeited. On these executions, no return having been made, the land was ordered to be sold on the sale day in October, 1897. Notice that the sale would take place was given by W. H. Castle to the son and agent of Luther H. Hankinson. He, however, did not communicate this to his father until after the day of sale. Luther H. Hankinson went to the sale. He did not see there either Mr. Castle or any one of the firm of Fleming & Alexander, who were his attorneys. It seems that these gentlemen, being otherwise engaged, had sent Mr. J. R. Randall to represent them, with instructions to bid up to the gross amount of the judgments, some $1,800. Mr. Hankinson did not know by what authority or for what purpose Mr. Randall was bidding. He then bid himself, and finally became the purchaser at and for the sum of $2,000, paid the money, and received a deed from the sheriff conveying the land in fee.

This bill is filed by James Boyd, William H. Castle, and Martin Lane, averring that they are creditors and stockholders in the Southern Pine-Fiber Company, acting in behalf of themselves and others similarly situated, against Luther H. Hankinson, and Owen Alderman, the sheriff of Aiken county. The purpose of the bill is to set aside the sale to Hankinson, and to place the property in the hands of a receiver for the use of the stockholders and creditors of the fiber company, unless Hankinson will pay the estimated value of the property, to wit, $5,000. The bill proceeds with a double aspect. It charges that Hankinson was under contract to purchase this property for $5,000; that under this contract the property was to be sold at sheriff's sale, to be bought in by Castle, and by him to be conveyed to Luther H. Hankinson; that the purchase by the latter at sheriff's sale, for himself, at the reduced price of $2,000, was a violation of his contract and a breach of trust. It also charges that the levy and sale were void, the sale having been made after the dissolution of the defendant corporation.

It will be noticed that in all the correspondence between Luther H. Hankinson and Mr. Castle he always insists on proper titles. If, then, it be true that by this sale no title passed, surely he cannot be bound to take the property as in one prayer of the bill is asked.

The first question is, was there an existing contract between Hankinson and Castle at the time of this sale? If the corporation has been dissolved, all executory contracts with it fell to the ground. Besides this, as Castle's offer was subject to the approval of the stockholders, the dissolution prevents this approval. Was there afterwards any contract between Castle and Hankinson? It was suggested that Castle go on and get title as he proposed under execution. Hankinson consented, provided that he got the obligation of Castle that the property would not cost Hankinson more than $5,000. This

obligation he never received. The minds of the contracting parties never concurred. Was this provision by Hankinson material? Castle proposed as the price of the property $5,000. He declared his plan to be a sale at public auction, at which he would buy the property, and, if it was bid in for that sum or less, he would convey it to Hankinson. If it brought more, he would not be bound to convey. So Hankinson was bound, at all events, to take the property. Castle was only bound to convey if it brought at public auction $5,000 or less. The sale was to be at public auction. The world was invited to bid. What sort of guaranty did Hankinson have that no bid would exceed $5,000? His condition for a bond had not been fulfilled. Any chilling of the sale would vitiate his title. He was wholly without protection. It is true that the result showed that Castle could have gotten the property for less than $5,000. But why should Hankinson assume this risk? He was at the mercy of Castle, whose refusal to give the security required showed either doubt or intention. He was at the mercy of any one who may have wanted the property, which, in the argument, was said to be worth more than the price named. The essential elements of a contract were wanting between these parties.

Was there any fiduciary relation existing between these parties binding the conscience of Hankinson, and preventing him from bidding at the sale? The contract was still open. His condition had not been fulfilled. It could have been fulfilled at any time before the sale. So he attended in order to see if this would be done. He did not see Castle there or either of the firm of Fleming & Alexander. He did not know what the business of Mr. Randall was at the sale, nor was he bound to inquire, nor was Mr. Randall bound to tell him. At a public auction each bidder acts without obstruction or interference with the others. From the absence of Castle and of his attorneys he had every reason to think that the plan had been abandoned, and he had the right to take care of himself.

The next question is as to the title. Was the sale a good one, and did it pass the title to the property? The executions were levied in 1893. In South Carolina the active energy of the execution lasts for 10 years. When a cause has been tried, judgment obtained and entered, and execution issued and levied, the rights of the parties have become fixed. No new proceedings are necessary. If the defendant die after this, his death does not prevent the sale under execution (Taylor v. Doe, 13 How. 287; Fishburne ad Verdier, 1 Speer, 347); nor his bankruptcy (Savage's Assignee v. Best, 3 How. 111). This being so, if an execution gives vested rights, not in any way affected by the life or death of the defendant, the rule must apply as well to corporations which are dissolved as to natural persons. The death, natural or civil, of the latter does not defeat the right to sell. So the civil death of the former cannot defeat this right. Besides this, all proceedings under an execution relate back to its teste (Erwin's Lessee v. Dundas, 4 How. 76), and it is so treated. At the teste of this writ the corporation was in full enjoyment of its franchises, and the sale is good. This matter has been discussed as if the proclamation of the governor of New Jersey dissolved this

corporation. Giving it the full effect it can claim, it did only terminate its right to do new business as a corporation. The laws of New Jersey (Sess. Laws 1896, p. 295) contain this provision:

"Sec. 53. All corporations, whether they expire by their own limitation or be annulled by the legislature or otherwise dissolved, shall be continued bodies corporate for the purpose of prosecuting and defending suits by or against them, and of enabling them to settle and close their affairs, to dispose of and convey their property and to divide their capital, but not for the purpose of continuing the business for which they were established."

So this corporation continues as a body corporate for the purpose of prosecuting and defending suits. If it can bring and defend suits, it can issue executions, and have them issued against it, with the legal results of both.

As to the question which has been discussed involving the forfeiture of this charter and the construction of the law of New Jersey no opinion is expressed. The bill is dismissed, with costs.